388 S.E.2d 288

**Sherry Lou CLAY**

v.

**Roger Dean CLAY.**

No. 18988.

Supreme Court of Appeals of
West Virginia.

Dec. 20, 1989.

Peter A. Hendricks, Madison, for Sherry Lou Clay.

E. Elton Byron, Jr., Abrams, Byron, Henderson & Richmond, Beckley, for Roger Dean Clay.

BROTHERTON, Chief Justice:

Sherry and Roger Clay were married in Whitesville, West Virginia, on May 4, 1971. Two minor children were born of this marriage, which was dissolved by an order of the Circuit Court of Raleigh County entered on July 29, 1986. Sherry, age thirty-four, is a homemaker, while Roger, age thirty-eight, is engaged in the practice of general and orthodontic dentistry.

During the initial stages of the Clays' divorce proceedings, one attorney prepared Mrs. Clay's complaint and Dr. Clay's answer, as well as their property settlement agreement. The Clays entered into a written property settlement agreement on July 10, 1986. According to terms contained in the property settlement agreement, the parties understood that the attorney who prepared the agreement was serving as counsel for the plaintiff, Mrs. Clay.[1] On July 25, 1986, Mrs. Clay appeared at the final divorce hearing with this attorney. The property settlement agreement was subsequently approved by the court and its terms were ratified and merged into and made a part of the final divorce order entered on July 29, 1986.

Under the agreement, Mrs. Clay received custody of the two minor children and was awarded $2,000 per month alimony and $250 per month for the support of each child. A provision in the agreement modified the support payments if Mrs. Clay remarried, terminating alimony and increasing support to $500 per month for each child. The agreement also stipulated that if the children attended college within

---

1. The property settlement agreement provided, in part, that: "The parties understand that Pat C. Fragile, the preparer of this Agreement, is counsel for the Plaintiff; and that the Defendant, in signing this Agreement has relied upon his own personal judgment and has not relied upon any representation by Pat C. Fragile in connection with the signing of this Agreement."

one year of their high school graduation, Dr. Clay would continue to make support payments during the time they were enrolled in college.

Other terms of the Clays' property settlement agreement provided that Dr. Clay would be responsible for reasonable and necessary medical, dental and professional expenses incurred by the children; that Dr. Clay would pay Mrs. Clay $80,000 with which to buy or build a new home for herself and the children; that Mrs. Clay would have the "exclusive use and possession" of the marital home and four lots located in Whitesville, West Virginia, until a new home was purchased or constructed,[2] provided this was accomplished by January 1, 1987, when Mrs. Clay was to vacate the premises and convey her interest in the home and lots to Dr. Clay by general warranty deed; that Dr. Clay was granted the exclusive use, possession and ownership of a lot in Chickasaw, West Virginia, and a lot and business building, along with all its furnishings and supplies, located in Whitesville, West Virginia; that Mrs. Clay agreed to release any claim to Dr. Clay's professional dental license and any future income arising from his dental practice; that Mrs. Clay received a 1983 Buick Park Avenue and Dr. Clay agreed to pay her an additional $6,500 so that she could trade the 1983 Buick Park Avenue for another vehicle; that Dr. Clay received a 1986 Mercedes Benz, a 1986 Chevrolet pick-up truck, and a 1977 Buick; that Dr. Clay agreed to establish trust funds to provide child support and alimony in the event of his death, which were to be funded with life insurance policies in the principal amount of $100,000 for each child and $100,000 for Mrs. Clay; that each party was to have the "exclusive use, possession and ownership of the household furnishings and appliances currently in [his or her] possession;" and, each party was given the exclusive use, possession and ownership of their respective HR–10 and I.R.A. accounts.

As the parties agreed, Mrs. Clay and the two children lived in the marital residence for approximately six months following the entry of the final divorce order. During this time, Mrs. Clay purchased a dog for the children. According to representations contained in Mrs. Clay's brief to this Court, the dog was "less than housetrained and made certain deposits in the interior of the dwelling." After Dr. Clay regained possession of the house, he filed a petition to modify the final divorce order on March 18, 1987. In this petition, Dr. Clay asked for the restoration of certain personal property, specific child visitation rights, and a reduction in alimony for "uncontemplated and unexpected damage to the marital residence" which he alleged occurred during the six months Mrs. Clay and the children lived in the home.

By general order entered in the Circuit Court of Raleigh County, the matter was referred to a family law master. On April 2, 1987, a hearing on Dr. Clay's petition for modification was held before Family Law Master Truman L. Sayre. At the conclusion of the hearing, the family law master recommended that an $11,538 judgment be entered against Mrs. Clay for damages to carpeting, walls, and two doors in the marital residence. This judgment was to be satisfied by reducing Mrs. Clay's alimony by $500 each month, beginning in April, 1987, and continuing until the amount was paid in full. Mrs. Clay filed exceptions to the family law master's recommended decision on April 24, 1987, and requested review.

On August 19, 1987, Mrs. Clay filed a petition seeking to set aside the written property settlement agreement or, in the alternative, to modify what she referred to as its "locked in" child support provisions. Mrs. Clay specifically asked that the court require both parties to make financial disclosures to show the net value of the items in the property settlement agreement.

On November 30, 1987, Raleigh County Circuit Court Judge C. Berkeley Lilly issued an opinion letter in which he reviewed Mrs. Clay's exceptions to the family law master's recommended decision and denied

---

**2.** While she occupied the home, Mrs. Clay was responsible for utility payments. Dr. Clay was responsible for any indebtedness on the residence, taxes, and insurance.

her August 19, 1987, petition to set aside or modify the written property settlement agreement. In denying this petition, Judge Lilly specifically found that Mrs. Clay was represented by counsel during the divorce proceedings and stated that "[t]he Court dealt with the parties as being over 18, competent and knowledgeable about what they were doing." Judge Lilly stated that neither party requested that the court require certain financial disclosures, and the court assumed that the information was available to both parties. Further, Judge Lilly found that Mrs. Clay did not allege or establish fraud or mistake of fact in the execution of the property settlement agreement.

Addressing the family law master's recommendations, Judge Lilly agreed that the evidence supported Dr. Clay's contention that Mrs. Clay did not take care of the home. However, Judge Lilly reduced the amount of damages assessed against Mrs. Clay, finding that:

> I believe the evidence does reflect that for a brief period that Dr. Clay purchased and had a non-housebroken dog in the home and that it may have contributed one, two or three spots on the carpet. For that reason, the carpet damage will be reduced to an even $10,000.00.

Judge Lilly also disallowed $550 in damages awarded for paint and door repair and ordered that alimony be reduced in the amount of $250 a month, not $500 as the family law master recommended, until the $10,000 judgment was satisfied. An order reflecting these conclusions was entered in the Circuit Court of Raleigh County on March 21, 1988.

Mrs. Clay now appeals from the March 21, 1988, order. In her first assignment of error, the appellant argues that the trial court erred in arbitrarily approving the property settlement and neglecting to look behind the terms of the agreement in order to determine the income of the parties, the defendant's ability to pay support, and the net value of the marital estate and how it was divided.

The appellant suggests that we follow our holding in *Somerville v. Somerville,* 179 W.Va. 386, 369 S.E.2d 459 (1988), in which, the appellant states, "this Court ... considered a claim that one of the parties to a divorce had entered into an 'unconscionable' agreement." We concluded that the settlement agreement in *Somerville* was void "because it was based on the trial court's ruling that 30% of the marital property should be awarded to appellant [Mrs. Somerville], 70% to appellee [Mr. Somerville]...." *Id.* 179 W.Va. at 390, 369 S.E.2d at 463.

In that case, the appellant, Mrs. Somerville, argued that "the court erred in awarding her only 30% of the marital property without findings on the record that would justify deviation from the statutory presumption that marital property should be divided equally." *Id.* 179 W.Va. at 388, 369 S.E.2d at 461.[3] We agreed that the trial court abused its discretion when it failed to articulate the reasons for its unequal division of the Somervilles' marital property, and, therefore, the subsequent written settlement agreement which reflected the trial court's 30/70 marital property distribution was deemed void.

As these facts demonstrate, our holding in *Somerville* is not applicable to this case.

---

**3.** In the absence of a valid agreement between the parties, W.Va.Code § 48–2–32(c) lists the factors a court is to consider when deviating from an equal division of marital property. The court is required to articulate its reasons for an unequal division, as W.Va.Code § 48–2–32(f) states that:

> In any order which divides or transfers the title to any property, determines the ownership of value or any property, designates the specific property to which any party is entitled, or grants any monetary award, the court shall set out in detail its findings of fact and conclusions of law, and the reasons for dividing the property in the manner adopted.

After reading W.Va.Code § 48–2–32(c) together with § 48–2–32(f), we reached the "inescapable conclusion" in *Somerville* that:

> ... in order to be sustained, an order directing a division of marital property in any way other than equally must make specific reference to factors enumerated in § 48–2–32(c), and the facts in the record that support application of those factors. Such a discretionary determination must result from a rational application of the statute to facts on the record, and this reasoning must be reflected in the order and must support the property division directed.

179 W.Va. at 389, 369 S.E.2d at 462.

The terms of the Clays' final divorce order were agreed to by the parties in the written property settlement agreement prior to the entry of the final order. Thus, it was not necessary for the court to attempt to make any other division of the marital property.

The appellant also cites W.Va.Code §§ 48–2–16(b), 48–2–32(b), and 48–2–32(c) in support of her argument that the trial court erred in arbitrarily approving the property settlement agreement. Under W.Va.Code § 48–2–32(b) (1986), when the parties to a divorce action have executed a separation agreement, marital property is to be divided in accordance with the terms of the agreement, unless the court finds:

(1) That the agreement was obtained by fraud, duress, or other unconscionable conduct by one of the parties, or

(2) That the parties, in the separation agreement, have not expressed themselves in terms which, if incorporated into a judicial order, would be enforceable by a court in future proceedings, or

(3) That the agreement, viewed in the context of the actual contributions of the respective parties to the net value of the marital property of the parties, is so inequitable as to defeat the purposes of this section, and such agreement was inequitable at the time the same was executed.

The next provision, W.Va.Code § 48–2–32(c), applies when there is not a valid agreement between the parties.

(c) In the absence of a valid agreement, the court shall presume that all marital property is to be divided equally between the parties, but may alter this distribution, without regard to any attribution of fault to either party which may be alleged or proved in the course of the action. . . .

The appellant contends that these statutes require a trial court to "look behind the agreement, even if in [a] perfunctory fashion, to determine the fairness and equity of the division." However, in this case, the agreement was not "incomplete or insufficient to resolve the outstanding issues between the parties," nor did the court have reason to find "the separation agreement of the parties not to be fair and reasonable or clear and unambiguous," in which case W.Va.Code § 48–2–16(b) (1986), requires that "the court shall proceed to resolve the issues outstanding between the parties."

To the contrary, the trial court accepted the Clay's property settlement agreement because the appellant and her attorney represented that they were satisfied with the agreement. Prior to the entry of the final divorce order, neither the appellant nor her attorney objected to any of the agreement's provisions or alleged that the agreement was obtained by fraud, duress, or any other type of unconscionable conduct. We do not believe that the legislature intended to force upon a trial court an affirmative duty to question the wisdom of a spouse's apparent satisfaction with the terms of a property settlement agreement, especially when that spouse is represented by counsel.[4] However, recent statutory amend-

---

**4.** In *Pajak v. Pajak,* 182 W.Va. 28, 385 S.E.2d 384 (1989), we discussed these issues in the context of the validity of a prenuptial agreement and stated, at syllabus point 1, that:

> although advice of independent counsel at the time parties enter into a prenuptial agreement helps demonstrate that there has been no fraud, duress or misrepresentation, and that the agreement was entered into knowledgeably and voluntarily, such independent advice of counsel is not a prerequisite to enforceability when the terms of the agreement are understandable to a reasonably intelligent adult and both parties have had the *opportunity* to consult with independent counsel.

Further, in syllabus point 2 we explained that complete financial disclosures by the parties were not necessary to make an agreement enforceable:

> . . . it is not necessary that before the agreement was executed the parties meticulously disclosed to one another every detail of their financial affairs: it is sufficient if the party against whom the agreement is to be enforced had a general idea of the other party's financial condition and there was no fraud or concealment that had the effect of inducing the party to be charged into entering an agreement that otherwise would not have been made.

Certainly, in the case now before us, it appears as though the appellant had more than a passing familiarity with her husband's financial condition and that no efforts were made to prevent

ments create an exception for the child support provisions of such agreements.

West Virginia Code § 48A–2–8 now requires a family law master or circuit court judge to apply guidelines established by the child advocate office when awarding an amount of child support.[5] If this statute had been in effect during the Clays' divorce proceedings, the trial judge would have been required to inform both parties of the amount of child support proposed by application of the guidelines, and then award this amount unless each party made a "knowing and intelligent waiver" of the amount and entered into an agreement otherwise providing for child custody and support.[6]

■ The appellant's specific argument with regard to child support is that the trial court erred in approving or refusing to modify a provision in the property settlement agreement which "locks-in the amount of financial support the minor children of the marriage are to receive" in the event of her remarriage. As we indicated in our recitation of the facts, the agreement between the parties provided that Dr. Clay would pay $250 per month per child for their support and maintenance but that "if Sherry remarries and alimony is terminated, said child support payments shall be increased to $500.00 per month per child."

We believe the appellant's concern over the agreement's so-called "locked in" child support provision is misguided. Although the parties agreed to a set amount of child support in the property settlement agreement, the amount of support a child is entitled to is never "locked-in" under West Virginia law, as "[c]hild support shall, under all circumstances, always be subject to continuing judicial modification." W.Va. Code § 48–2–16(a) (1986).[7]

■ Under the terms of the Clays' settlement agreement, the appellant automatically receives an increase in child support payments if she remarries. This Court has recognized that the "remarriage of a divorced parent, standing alone, is not sufficient to justify modification of a child support order," but remarriage is "a circumstance that may be considered in weighing the equities of the situation, where other factors are present which may warrant the trial court, in its sound discretion, to modify the order." Syl. pt. 3, *Lambert v. Miller*, 178 W.Va. 224, 358 S.E.2d 785, 786 (1987). Our holding in *Lambert* does not forever bar a change in child support provisions that have been set under a separation agreement. However, "the party petitioning for a modification of the support provisions of a divorce decree bears the burden of showing a substantial change of circumstances." Syl. pt. 3, *Goff v. Goff*, 177 W.Va. 742, 356 S.E.2d 496 (1987).

In this case, it appears as though the appellant actually benefits from the settlement provision which gives her an automatic increase in child support if she remarries because, under *Lambert*, her remarriage alone would not constitute a substantial change of circumstances justifying child

financial disclosures or otherwise conceal such information.

5. Other guidelines for child support awards are found in 6 *West Virginia Code of State Rules* § 78–16–18 (eff. May 2, 1988).

6. West Virginia Code § 48A–2–8 (1989) states that there are two instances in which the guidelines should not be followed:

(1) When the child support award proposed to be made pursuant to the guidelines has been disclosed to the parties and each party has made a knowing and intelligent waiver of said amount, and the support obligors have entered into an agreement which provides for the custody and support of the child or children of the parties; or

(2) When the child support award proposed to be made pursuant to the guidelines would be contrary to the best interests of the child or children, or contrary to the best interests of the parties.

7. *See Stewart v. Stewart*, 177 W.Va. 253, 351 S.E.2d 439 (1986), in which we stated in the syllabus:

"Under the provisions of W.Va.Code, 48–2–15, as amended, jurisdiction to provide for the support, maintenance and education of a minor child is not abrogated or limited by the existence of child support provisions in a property settlement agreement which has been 'ratified and confirmed' in a divorce decree." Syl.Pt. 2, *State ex rel. Trembly v. Whiston*, 159 W.Va. 298, 220 S.E.2d 690 (1975).

support modification. Of course, if the appellant were able to offer evidence of other factors, in addition to remarriage, which would warrant modification, the court may find the increase to $500 to be insufficient.

■ The appellant also claims that the trial court erred in denying her a hearing on her petition to set aside the separation agreement, or, in the alternative, to modify certain provisions of the agreement. On August 19, 1987, the appellant filed a petition seeking to set aside or modify the written property settlement agreement. In a letter to Judge Lilly dated August 25, 1987, appellant's counsel asked whether either Judge Lilly or Family Law Master Truman L. Sayre "would entertain a motion to permit additional evidence to be offered in the matter under review."[8] On September 2, 1987, Judge Lilly responded to appellant's counsel and informed him that, generally, when a divorce has become final, a circuit court judge or family law master will reopen the case only when "there has been a change of circumstances or the needs of the infant children require it." Judge Lilly then stated, "If you want to present additional evidence, I suggest you seek to reopen before the Master."

The appellee filed a motion to dismiss the appellant's August 19, 1987, petition on September 2, 1987, arguing that the petition was untimely under Rule 60(b) of the West Virginia Rules of Civil Procedure, which requires that motions for relief from a final order be made within eight months of the judgment.

A hearing was held before Family Law Master Sayre on September 22, 1987, and the appellee's Rule 60(b) motion to dismiss, then pending before Judge Lilly, was discussed, along with other issues. The appellant states that "counsel for appellant was ready to proceed with a hearing on the merits of her [August 19, 1987] Petition" but the parties had agreed that this hearing would not be held until the court addressed several procedural matters. Although appellant's counsel requested that

the petition to set aside or modify the property settlement agreement be heard by the family law master, the appellant states that "the Family Law Master felt that the problems complained of by the appellant were best suited to be addressed by and ruled upon by the Circuit Court, and accordingly, referred the matter to Judge Lilly."

On November 3, 1987, Judge Lilly addressed a letter to counsel in which he informed both parties that he had received the transcript of the testimony taken before the family law master and "[i]f you will advise me what you would like to do in this case, then I will arrange my schedule and try to accommodate you."

In a memorandum opinion dated November 30, 1987, Judge Lilly stated that "[b]y letter dated November 3, 1987, the Court wrote counsel soliciting their input as to any matter pending or the scheduling of any hearing. Counsel did not respond." Judge Lilly then reviewed the family law master's recommended decision and also denied the appellant's August 19, 1987, petition to set aside or modify the property settlement agreement. For reasons not disclosed in the record now before us, Judge Lilly apparently did not rule on the appellee's September 2, 1987, motion to dismiss the appellant's petition as untimely under Rule 60(b).

On February 23, 1988, the parties appeared with counsel at a hearing before Judge Lilly. The appellant's counsel once again argued that a hearing had never been held and thus, should be held on the August 19, 1987, petition to set aside or modify the written property settlement agreement. Judge Lilly ordered that all matters before the court were taken under advisement and would be ruled upon. In a March 31, 1988, order, Judge Lilly denied and dismissed the appellant's petitions for the reasons set forth in his November 30, 1987, memorandum opinion.

The appellant now contends that her counsel did respond to Judge Lilly's November 3, 1987, inquiry with a letter in

8. The letter did not specify whether "the matter under review" referred to Judge Lilly's review of the family law master's recommended decision or the appellant's August 19, 1987, petition to set aside or modify the written property settlement agreement.

which he requested a hearing on the August 19, 1987, petition. Both Judge Lilly and counsel for the appellee state that they did not receive this letter from the appellant. A copy of the letter, dated November 4, 1987, is attached to the appellant's reply brief to this Court and labelled "Appellant's Exhibit # 4." In the letter, the appellant's attorney refers to problems with transcribing the tapes of a hearing held before the family law master. However, the appellant's attorney made no request for a hearing in this letter, unless we are asked to construe his closing—"I look forward to being in your court in the very near future"—as such a request. This Court would not expect Judge Lilly to have interpreted this remark as a request by the appellant for a hearing on the August 19, 1987, petition to set aside or modify the property agreement.

It is clear that Judge Lilly's November 3, 1987, letter gave the appellant a final opportunity to request a hearing. When no request was made, Judge Lilly proceeded to rule on the appellant's request for review of the family law master's recommended decision, as well as her petition to set aside or modify the written property settlement agreement. Judge Lilly never expressly ruled on the appellee's motion to dismiss the appellant's August 19, 1987, petition as untimely under Rule 60(b), although ultimately, the petition was dismissed. However, consistent with our holding in *Savas v. Savas,* 181 W.Va. 316, 382 S.E.2d 510 (1989), we believe the petition was indeed untimely, as it was filed more than eight months after the final order was entered.

These proceedings were obviously plagued by a lack of effective communication between both parties, the family law master, and the circuit court. Although we are convinced that this case could have travelled a smoother procedural path, we find no error in the fact that the appellant did not have a hearing on the August 19, 1987, petition.

■ In her final assignment of error, the appellant argues that the trial court erred in awarding the appellee a $10,000 judgment for damages to carpeting in the marital home, and subsequently reducing alimony in order to satisfy the judgment, without considering the effect that the reduced support would have on the parties.

On March 18, 1987, the appellee filed a petition to modify the final divorce order. In this petition, the appellee asked for specific child visitation rights, the return of certain personal property, and a reduction in the amount of alimony payable to the appellant, in order to compensate the appellee for approximately $12,000 in damages to the marital residence.

A transcript of the family law master's April 2, 1987, hearing on this petition is not contained in the record now before this Court. However, a representative of a local carpet dealer apparently testified for the appellee and stated that damage to the carpeting in the marital home necessitated its replacement. After hearing the evidence, the family law master stated in his recommended decision that the carpeting throughout the home and the walls in one room in particular were in a "condition of disrepair" and that "the evidence of no apparent upkeep by the plaintiff, Sherry Lou Clay, in the ground surrounding the marital residence was a material shortcoming on the part of the plaintiff, Sherry Lou Clay."

The family law master found that "repair and replacement of the damaged carpeting which was comparatively new and had suffered little depreciation except for a short period of excessive wear and tear" would cost $10,988, while repairs to the walls and two doors would cost $550. The family law master concluded that the appellee was entitled to reimbursement from the appellant in the amount of $11,538. The appellant's alimony was to be reduced $500 per month beginning in April, 1987, and continuing until the appellee had received credit for the total amount of $11,538.

Upon review, Circuit Court Judge Lilly agreed that the evidence presented at the April 2, 1987, hearing supported the family law master's finding that the appellant "failed to care for and look after" the home from July 29, 1986, to January 1, 1987, "as

an ordinary, reasonable tenant, reasonable wear and tear excepted." In a memorandum opinion dated November 30, 1987, Judge Lilly stated that the appellant was a trustee of the marital home with a "duty to protect the house from the dog's bladder and bowel movements," and thus the appellant breached an implied duty of care by "[l]etting an untrained dog or puppy urinate or defecate all through the house." However, Judge Lilly expressed concern that the appellee's own "non-housebroken" dog "may have contributed one, two or three spots on the carpet," and, therefore, he reduced the award for carpet damages to $10,000.

Although Judge Lilly agreed with the appellant's contention that this "could have been" a separate tort or negligence action, we need not address the merits of such an action at this time. Our concern is limited strictly to the issue of whether the lower court had the authority to award monetary damages to the appellee in a modification proceeding.

■ This Court has recognized that "the powers possessed by a family law master are restricted to those conferred by statute." *Segal v. Beard*, 181 W.Va. 92, 380 S.E.2d 444, 447 (1989). The jurisdiction of a family law master in a modification proceeding is found in W.Va.Code § 48A–4–1(i)(4) (1986), which provides that:

(i) A circuit court or the chief justice thereof shall refer to the master the following matters for hearing to be conducted pursuant to section two [§ 48A–4–2] of this article:

.  .  .  .  .

(4) All petitions for modification of an order involving child custody, child visitation, child support or spousal support filed after the first day of December, one thousand nine hundred eighty-six;

We do not believe that the family law master's authority to modify orders involving child support and alimony can be interpreted to permit the court to award monetary damages in a modification proceeding, as was done in this instance, and to then satisfy the judgment by reducing alimony.

The appellee contends that the damage to the carpeting in the marital home constituted a "substantial change of circumstances which was uncontemplated by either of the parties at the time the Final Order was entered," and thus, the family law master had the authority to award damages. However, a change in the condition of the carpeting in either party's home is not the type of "substantial change in circumstances" contemplated by the use of this phrase in modification proceedings. Although we have recognized that "what constitutes a 'substantial change in circumstances' is often incapable of precise definition," *Lambert*, 178 W.Va. at 226, 358 S.E.2d at 787, it most often refers to circumstances which have substantially impacted upon the financial resources and economic needs of the parties subsequent to their divorce.

A trial court may consider various factors to determine if a substantial change in circumstances has occurred. Among some of the factors or circumstances considered include: a change in the financial resources or ability to pay on part of the parent obligated to pay support, needs of the child or children for whom support is paid, a good or bad faith motive of the obligated parent in sustaining a reduction of income, and the duration of the change, namely, whether the change is temporary or permanent.

*Id.* Whether the appellant actually damaged the carpeting in the marital home is immaterial to our consideration of the propriety of the lower court's award of damages to the appellee and its decision to reduce the appellant's alimony in order to compensate the appellee for the alleged damages.

■ The sole purpose of an award of alimony is to provide for the support of a former spouse. In the absence of a substantial change in circumstances warranting modification, alimony should not be reduced as a method of punishing a former spouse. In this case, the parties agreed prior to the divorce that the appellee would pay the appellant $2,000 per month for her support. This Court assumes that when the appellant entered into this agreement,

she believed that $2,000 per month would permit her to live comfortably with her two children. Thus, the decision to reduce the appellant's alimony each month, without considering her financial needs, in order to reimburse the appellee for expenses incurred in having his carpeting replaced, was erroneous. We conclude that the court below did not have the authority to award the appellee monetary damages in the modification proceedings and to then satisfy the judgment by reducing his support payments.

The March 21, 1988, order of the Circuit Court of Raleigh County is reversed insofar as it awarded the appellee $10,000 for damages to carpeting and reduced the appellant's alimony $250 per month until the $10,000 judgment against her was satisfied. This case is remanded to the Circuit Court of Raleigh County for further proceedings consistent with this opinion.

Reversed in part; affirmed in part; and remanded.